**FILED**

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

SEP 0 9 2014

CLERK

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| MICHAEL J. MYERS, | * | CIV 14-4121 |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | MEMORANDUM OPINION ON |
| | * | MOTION FOR |
| JASON M. GANT, in his official | * | PRELIMINARY INJUNCTION AND |
| capacity as Secretary of State for the | * | MOTION TO DISMISS |
| State of South Dakota, | * | |
| | * | |
| Defendant. | * | |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This matter is before the Court on a motion for a preliminary injunction filed by Plaintiff Michael J. Myers (Myers), and a motion to dismiss the complaint filed by Defendant Jason M. Gant (Gant). Argument on both motions was heard on August 18, 2014, in Sioux Falls, South Dakota. The Court orally announced that the motion for a preliminary injunction was granted and that the motion to dismiss the complaint was denied. The Court set forth on the record a summary of the basis for its rulings, and issued a short order on the motions. For each of the reasons stated by the Court on the record, and as follows, Myers' motion was granted and Gant's motion was denied.

## FINDINGS OF FACT

On January 7, 2014, Myers declared his intention to run as a non-party independent candidate for Governor of South Dakota in the November 2014 election. On January 9, 2014, Myers and Caitlin F. Collier (Collier) filed a form with the Secretary of State entitled "Independent Candidate for President or Governor Declaration of Candidate and Certification of Running Mate." This form stated Myers intention to run for governor and certified Collier as his lieutenant governor candidate. Collier, in turn, certified under oath that she agreed to serve as a candidate for lieutenant governor. Next, Myers circulated his nominating petition.[1] Collier's name was not required to and did not

---

[1] In order to be placed on the general election ballot, South Dakota law requires a non-party independent candidate for governor to gather a nominating petition signed by no less than one

appear on the Myers' nominating petition.  On April 23, 2014, Myers submitted his nominating petition with more than the required number of signatures of registered voters to the South Dakota Secretary of State's Office, which approved Myers' nomination as a non-party independent candidate for governor.

On or before June 12, 2014, Collier informed Myers that she needed to withdraw from the race for personal reasons.  On June 16, 2014, the Secretary of State's Office received a notarized form from Collier entitled "Candidate's Request to Withdraw Nomination."

On July 8, 2014, Myers announced at a press conference in Sioux Falls his nomination of Lora Hubbel to replace Collier as his running mate. That same day, Hubbel signed and submitted the bottom portion of an "Independent Candidate For Governor Declaration of Candidate and Certification of Running Mate" form to the South Dakota Secretary of State's Office to get her name placed on the election ballot as Myers' running mate.[2]  This notarized form was received by the South Dakota Secretary of State's Office on July 15, 2014.

On July 18, 2014, the Secretary of State's office notified Hubbel and Myers by letter that Hubbel could not be certified as the candidate for lieutenant governor and Collier could not be removed from the ballot. According to Gant's letter, there is no South Dakota law allowing a non-party Independent gubernatorial candidate to certify a replacement candidate for lieutenant governor after the candidate has met the deadline for circulating and filing his or her nominating petition.[3] Gant also stated that Collier cannot simply drop off the ballot because Article IV section 2 of the

---

percent (1%) of the total votes cast for governor in the previous certified gubernatorial election. *See* SDCL § 12-7-1. This type of direct nomination is necessary because non-parties do not have a party process for the nomination of candidates for governor and lieutenant governor.

[2] Later, Myers certified Hubbel as the lieutenant governor candidate.

[3] The filing deadline for non-party independent candidates of this election cycle was April 29, 2014. *See* SDCL § 12-7-1. Collier withdrew her nomination as lieutenant governor on June 12, 2014.

South Dakota Constitution requires that the governor and lieutenant governor be jointly elected. Gant believes South Dakota law requires naming Myers and Collier as the non-party candidates for governor and lieutenant governor on the November 2014 general election ballot even though Collier has withdrawn from the race.

South Dakota law allows party nominees for governor, such as Republicans and Democrats, to fill a vacancy created by the death or withdrawal of their running mate up until the second Tuesday in August, which was August 12, 2014, of this year's election cycle. *See* SDCL § 12-8-6. As with the nomination of a lieutenant governor, the replacement of a lieutenant governor candidate must be done by party vote and nomination. If a vacancy occurs for lieutenant governor, a statewide office, the State Party Central Committee is charged with the responsibility of replacing that nominee. SDCL § 12-6-56. "Vacancies filled by the State Central Committee shall be by unit representation, each county casting the number of votes cast in that county at the last general election for that party's candidate for Governor." SDCL § 12-6-57. According to Gant, this process ensures the nomination of a replacement for a party candidate for lieutenant governor is accomplished by the voters through their representatives within the party system. Gant contends that Collier's nomination was secured by the voters of South Dakota after certification by Myers and Collier that Collier agreed to serve as Myers' choice for lieutenant governor. Replacing Collier with Hubbel, Gant believes, would undo the will of over 3,000 voters who signed Myers' nominating petition with the expectation that Collier would be his running mate, and would disenfranchise those voters at the general election by denying them the opportunity to vote for the individual they expected to be the lieutenant governor candidate.

Myers claims that the failure to provide equal ballot access to non-party candidates imposes an unconstitutional burden on his First and Fourteenth Amendment rights of free association by effectively preventing him from replacing his running mate.

## CONCLUSIONS OF LAW

### I. Motion to Dismiss

#### A. Rule 12(b)(7)

Gant first argues that Hubbel and Collier are "necessary parties" because these proceedings affect their rights. Thus, Gant maintains, Myers' failure to join these parties warrants dismissal of this action pursuant to Federal Rule of Civil Procedure 12(b)(7).

> A person is necessary and must be joined as a party to an action, pursuant to Rule 19, if:
>
> (A) in that person's absence, the court cannot accord complete relief among existing parties; or (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed.R.Civ.P. 19(a). Gant does not claim that Hubbel or Collier fit within either of the two categories of "necessary" parties. Rather, he asserts that a judgment in Myers' favor will "affect" the women's rights. But Collier is trying to withdraw from the race for lieutenant governor and Hubbel is trying to join the race, so a judgment in Myers' favor will protect rather than impair their interests, and there is no risk of inconsistent judgments.

#### B. Rule 12(b)(6)

Next, Gant argues that Myers cannot prove any set of facts entitling him to relief and thus this case should be dismissed for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). The following discussion regarding the merits of Myers' motion for a preliminary injunction explains why the Rule 12(b)(6) motion to dismiss was be denied.

### II. Motion for Preliminary Injunction

The proper analysis of the preliminary injunction motion is found in *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 731-32 (8th Cir. 2008) (en banc) (reaffirming "that a party seeking a preliminary injunction of the implementation of a state statute must demonstrate

more than just a 'fair chance' that it will succeed on the merits. We characterize this more rigorous standard ... as requiring a showing that the movant 'is likely to prevail on the merits.'"). That case requires the Court to examine first the likelihood that Myers will prevail on the merits of his claim before the Court applies the remaining three factors of a preliminary injunction analysis: (1) the threat of irreparable harm or injury to the movant absent the injunction, (2) the balance between the harm to the movant and the harm that the injunction's issuance would inflict on other interested parties, and (3) the public interest. *Dataphase Sys,. Inc. v. CL Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981).

### A. Likelihood of Success on the Merits

As argued by Gant, States "may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997); *see also Storer v. Brown*, 415 U.S. 724, 730 (1974). Thus, voting regulations are not automatically subjected to heightened scrutiny. In *Anderson v. Celebrezze*, 460 U.S. 780 (1983), the Supreme Court set forth the appropriate analytical framework for determining the constitutionality of state ballot access restrictions:

> Constitutional challenges to specific provisions of a State's election laws ... cannot be resolved by any "litmus-paper test" that will separate valid from invalid restrictions.... Instead, a court must resolve such a challenge by an analytical process that parallels its work in ordinary litigation. It must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

*Anderson*, 460 U.S. at 789.

In *Anderson*, the Court considered the constitutionality of an Ohio statute that required independent parties to declare their presidential candidates in March, while the major political parties

could declare their nominees in primaries closer to election day. Celebrezze was an independent candidate who was precluded by the Ohio statute from appearing on the ballot because his statement of candidacy and nominating petition were not filed until May. Applying its balancing test, the Court first examined the burdens on independent voters. The Court found that the state's regulation would impose a significant injury to independent voters who may not be able to vote for the candidate of their choice. *Id.* at 788, 795. The Court stated that the "March deadline place[d] a particular burden on [...] Ohio's independent-minded voters," and a "burden that falls unequally [...] impinges, by its very nature, on associational choices protected by the First Amendment." *Id.* at 792-93. The Court also noted that "in the context of a Presidential election, state-imposed restrictions implicate a uniquely important national interest," and that Ohio's deadline not only "burden[ed] the associational rights of independent voters and candidates," but "place[d] a significant state-imposed restriction on a nationwide electoral process." *Id.* at 794-95.

Ohio identified three main interests advanced by the early filing deadline for independent candidates: voter education, political stability, and "equal treatment for partisan and independent candidates." *Id.* at 796. The Court recognized that "the States's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions," but specified that, as a court proceeds to the balancing phase of its inquiry, it must "determine the legitimacy and strength of each of [the asserted] interests." *Id.* at 789. The Court concluded that the deadline was not necessary to further any of these interests. With respect to voter education, the Court said that "in the modern world it is somewhat unrealistic to suggest that it takes more than seven months to inform the electorate about the qualifications of a particular candidate simply because he lacks a partisan label." *Id.* at 797. Regarding equal treatment, the Court found that "neither the administrative justification nor the benefit of an early filing deadline is applicable to an independent candidate." *Id.* at 800. As for political stability, the Court held that "the early filing deadline is not precisely drawn to protect the parties from "intraparty feuding," but instead it simply "discriminate[s] against independents." *Id.* at 804-05.

The Court ruled that the early filing requirement placed an unconstitutional burden on the voting and associational rights of the supporters of independent candidates because the burden on voters outweighed the State's minimal interest in imposing the deadline. *Id.* at 806.

In *Norman v. Reed*, 502 U.S. 279 (1992), the Supreme Court restated the *Anderson v. Celebrezze* balancing test in another ballot access case, and added the possibility of strict scrutiny review. At issue in *Norman* was an Illinois statute that prohibited candidates for county office from running under the "Harold Washington Party" (HWP) because an established political party by that name already existed in the City of Chicago. Because the Party had previously contested elections only in the City of Chicago, Illinois law required it to qualify as a "new party" in order to contest countywide elections under the HWP name. The party did not obtain the 25,000 signatures required to qualify in the Cook County suburban district.

The Court began its analysis by emphasizing the constitutional rights of citizens to create and develop new political parties which "advances the constitutional interest of like-minded voters to gather in pursuit of common political ends, thus enlarging the opportunities of all voters to express their own political preferences." *Norman*, 502 U.S. at 288 (citing *Anderson*, 460 U.S. at 793-94). Citing *Anderson*, the Court stated the standard of review:

> To the degree that a State would thwart this interest by limiting the access of new parties to the ballot, we have called for the demonstration of a corresponding interest sufficiently weighty to justify the limitation, and we have accordingly required any severe restriction to be narrowly drawn to advance a state interest of compelling importance.

*Norman*, 502 U.S. at 288-289. The Court noted that unless a new party had the resources to run a statewide campaign, it would be foreclosed from contesting elections outside the political subdivision in which it was established. *Id.* at 289. The Court concluded that the State's restriction on use of political party names imposed a severe burden on voters of new political parties. *Id.* at 289-90. The State's proferred interests in avoiding voter confusion and requiring a new party to demonstrate reasonable support before getting on the ballot were not compelling enough to justify this severe restriction. *Id.* at 290. Although the State's interests are valid, they could be met with

7

less burden on constitutional rights, such as by "requiring the candidates to get formal permission to use the name from the established party they seek to represent, a simple expedient for fostering an informed electorate without suppressing the growth of small parties." *Id.* at 290. Using strict scrutiny, the Court struck down the provision regarding the name of the party and the requirement that the party submit a petition signed by 25,000 people in each political subdivision before getting all of its candidates in one subdivision placed on the ballot.

Shortly after *Norman*, the Supreme Court addressed the *Anderson* balancing test again in *Burdick v. Takushi*, 504 U.S. 428 (1992). There, the Court upheld as constitutional a Hawaii ban on write-in voting. In discussing the standard of review, the Court noted:

> Under this standard, the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized when those rights are subjected to "severe" restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling importance." But when a state election law provision imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the State's important regulatory interests are generally sufficient to justify" the restrictions.

*Burdick*, 504 U.S. at 434 (internal citations omitted).

Burdick, the challenger, wanted to vote for an individual who had not filed a nominating petition and was not on the ballot. The Court began its analysis by rejecting Burdick's argument that strict scrutiny should be applied to his claim. The Court explained that although "voting is of the most fundamental significance under our constitutional structure," not all election regulations are subject to strict scrutiny because that would hamper a state's legitimate ability to regulate elections. *Id.* at 433 ("[T]o subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest. . . would tie the hands of States seeking to assure that elections are operated equitably and efficiently."). Noting that candidates have three other mechanisms for getting on the ballot in Hawaii, the Court concluded that the Hawaii ban on write-in voting imposed only a "very limited" burden on constitutional rights. *Id.* at 435-37. Moreover, the State has an interest in election administration, specifically in restricting the size of

8

the ballot, avoiding "sore-loser" candidates and preventing "party raiding." *Id.* at 439. Under the "more flexible standard" of *Anderson*, the Court concluded that Hawaii's statutory scheme posed only minimal barriers to potential candidates and that the State's asserted legitimate interest in election administration outweighed the limited burden the regulation imposed on voters. *Id.* at 434, 438-40.

Under *Anderson* and its progeny, this Court first must determine whether South Dakota law imposes a severe burden on constitutional rights of Myers and voters. A severe burden would trigger strict scrutiny, requiring the regulation to advance a state interest of compelling importance. If the law imposes a "reasonable, nondiscriminatory" limitation rather than a severe burden on First Amendment rights, the Court could apply a more deferential standard of review, as the Court did in *Burdick*, and the limitation would be justified by a State's "important regulatory interest." *Burdick*, 504 U.S. at 434. Accordingly, the Court will consider what burden is placed on the constitutional rights of voters and Myers and then balance that burden against the precise interests identified by the State and the extent to which these interests require that the constitutional rights be burdened.

### 1. Magnitude of Burden on First Amendment Rights

"A burden that falls unequally on new or small political parties impinges, by its very nature, on associational choices protected by the First Amendment." *Anderson*, 460 U.S. at 793. South Dakota's election laws governing a gubernatorial candidate's ability to fill a vacancy created by the withdrawal of a running mate apply only to party candidates and restrict non-party candidates from the same or similar benefits. South Dakota law requires non-party independent candidates for governor and lieutenant governor to remain the same with no replacements, starting when the gubernatorial candidate signs the declaration for office certifying his or her lieutenant governor selection. That certification must take place prior to circulation of the candidate's nominating petition. Circulation of the petition must begin soon enough to be completed by the last Tuesday of April when the nominating petition must be filed.[4] In contrast, South Dakota law allows political

---

[4] No petition or certificate of nomination may be circulated prior to the first day of January of the year in which the election will be held. SDCL § 12-7-1.1.

parties, on or before the second Tuesday in August, to fill vacancies that occur after the parties' primary elections. *See* SDCL § 12-8-6. This statutory scheme gives preferential ballot treatment to candidates of political parties. A fairer scheme would include a procedure to fill a vacancy caused by withdrawal of an independent gubernatorial candidate's running mate.

South Dakota's statutory scheme excluding Myers' true running mate from the general election ballot restricts the ability of Myers and his supporters to choose a lieutenant governor candidate, to place the candidate on the ballot, and to vote for that candidate in the election. It is a severe burden on the associational rights of Myers and South Dakota voters. This burden is magnified by the discriminatory effect of the scheme on non-party candidates. Thus, the State must show an interest of compelling importance to justify the heavy burden of meeting strict scrutiny analysis.

### 2. Precise Interests Identified by the State and Extent to Which the State Interests Justify the Burden on Constitutional Rights of Myers and Voters

Gant argues that the State has an interest in protecting the integrity of its political processes from frivolous or fraudulent candidacies and ensuring those appearing on the ballot have established genuine support. The Supreme Court has recognized the viability of these interests.

> There is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot—the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election.

*Storer*, 415 U.S. at 732 (quoting *Jenness v. Fortson*, 403 U.S. 431, 442 (1971)). Gant asserts that the Myers-Hubbel ballot does not enjoy the modicum of support necessary to be placed on the ballot because Myers announced Collier as his running mate before the voters signed Myers' nominating petition. According to Gant, the voters who signed Myers' nominating petition will be disenfranchised by denying them the opportunity to vote for the individual they expected to be the lieutenant governor candidate. This concern might be justified, but it is not compelling because the nominating petition for Governor only identifies Myers, not the lieutenant governor candidate,

10

indicating that the voters who signed the petition were doing so in support of Myers for governor and not necessarily in support of Collier for lieutenant governor.

Gant is concerned that Myers is allowed to select his running mate for lieutenant governor when there is a different procedure for the selection of a party candidate. For political parties, the nomination of lieutenant governor is made at the state convention, and the replacement of a lieutenant governor candidate due to vacancy must also be done by party vote and nomination. In contrast, non-party candidates, like Myers, do not, and indeed may not, participate in conventions. Instead, once a non-party gubernatorial candidate has the requisite number of signatures on a nominating petition, he or she goes to the general election ballot. The state legislature has provided a procedure for this process in SDCL § 12-7-1. The State does not take issue with the statutory scheme allowing the independent candidate to unilaterally select a running mate at the beginning of the nominating process and it is not clear why it is important to the State that filling a vacancy should be treated differently. The nature of a non-party candidacy for governor requires Myers to personally select his running mate both at the beginning of the race and if a vacancy occurs. The State's interest in prohibiting him from doing so is not justified, much less compelling.

Moreover, the State's current system causes more voter confusion than it alleviates if the withdrawn candidate, Collier, who has no intention of serving as lieutenant governor, is left on the ballot and the actual running mate, Hubbel, is not on the ballot. Voters deserve to know the names and ideas of the candidates on the ballot and that they are ready to serve. The legislature could establish some procedure for substitution of non-party candidates-- now there is no method provided. It is up to the legislature to select the method.

Another consideration is the similar situation in *Riemers v. Jaeger*, 827 N.W.2d 330 (N.D. 2013), where a gubernatorial candidate was kept off of the general election ballot as the Libertarian candidate due to a similar constitutional requirement that the governor and lieutenant governor be jointly elected. The lieutenant governor candidate did not qualify to be a candidate and there was no North Dakota procedure to name another candidate. The gubernatorial candidate was then not

allowed on the ballot as he had no lieutenant governor candidate as was required by the North Dakota constitution.

Following the analytical framework set forth by the Supreme Court in *Anderson v. Celebrezze* and its progeny, the Court finds that South Dakota's statutory scheme imposes a severe burden on the constitutional rights of Myers and his potential voters. Because the State has not shown that a compelling state interest is advanced by restricting the ability of non-party candidates such as Myers from replacing a running mate, the law violates the Constitution. For these reasons, the Court concludes Myers is likely to succeed on his challenge to the absence of a mechanism in the South Dakota statutes allowing him to replace his running mate.

### B. Irreparable Harm

Once a constitutional injury has been demonstrated, the Court assumes that Myers has satisfied the irreparable harm prong. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury"). Indeed, when a general election goes forward, any infringement on Myers' constitutional rights would be irreparable.

### C. Balance of Harms

The balance of harms analysis examines the harm of granting or denying the injunction upon the parties to the dispute and upon other interested parties, including the public. *Dataphase*, 640 F.2d at 114. Gant claims that requiring the State to place Hubbel's name on the ballot would thwart the State's legitimate interest in protecting the integrity of the ballot and maintaining a stable political system. As discussed above, under the circumstances present here, the harm Myers would suffer by not placing Hubbel's name on the ballot outweighs the State's interest. Furthermore, harm to Collier will be alleviated by allowing her to withdraw as a lieutenant governor candidate, and harm to Hubbel will be avoided by placing her name on the ballot as the candidate for lieutenant governor. The balance of harms weighs in favor of granting the motion for a preliminary injunction.

12

### D. Public Interest

The final *Dataphase* factor is the public interest. As mentioned above, South Dakota's statutory scheme excluding Myers' true running mate from the general election ballot impinges on the associational rights of voters who have a desire to vote for non-party candidate Myers and the lieutenant governor candidate who is ready and willing to serve in that capacity. The public interest factor favors corrective action in this case.

For these reasons, Plaintiff's motion for a preliminary injunction was granted and Defendant's motion to dismiss was denied.

Dated this 9ᵈ day of September, 2014.

BY THE COURT:

Lawrence L. Piersol
United States District Judge

ATTEST:
JOSEPH HAAS, CLERK
BY: _____
DEPUTY

13